IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2015 Session Heard at Memphis

**STATE OF TENNESSEE v. JAMES HAWKINS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 0806057      Chris Craft, Judge**

**No. W2012-00412-CCA-R3-DD   -   Filed August 28, 2015**

Defendant, James Hawkins, appeals from his Shelby County Criminal Court jury convictions of premeditated first degree murder, *see* T.C.A. § 39-13-202(a)(1); initiating a false report, *see id*. § 39-16-502, a Class D felony; and abuse of a corpse, *see id*. § 39-17-312, a Class E felony.  The jury sentenced Defendant to death for the first degree murder conviction based upon its findings that the defendant was previously convicted of one (1) or more felonies whose statutory elements involve the use of violence to the person, *see id.* § 39-13-204(i)(2); and that the defendant knowingly mutilated the body of the victim after death, *see id.* § 39-13-204(i)(13); and that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.  For the remaining felonies, the trial court imposed an effective sentence of 18 years' incarceration to be served consecutively to the death sentence.  On appeal, Defendant alleges that (1) the trial court erred by denying Defendant's motion to suppress his statements given to the police; (2) the trial court erred by refusing to accept Defendant's guilty pleas to counts two and three of the indictment; (3) the trial court erred by admitting statements made by the victim through the victim's children, through Melvin Gaither, and through an application for order of protection; (4) the trial court erred by admitting evidence of other acts in violation of Tennessee Rule of Evidence 404(b); (5) the trial court erred by admitting photographs of bone fragments taken from the victim;(6) the trial court erred by admitting crime scene photographs that had not been provided during pretrial discovery; (7) the trial court erred by permitting improper closing argument by the State; (8) the evidence is insufficient to support Defendant's conviction of first degree murder; (9) the trial court erred by not requiring the State to provide discovery concerning an ongoing investigation of sexual abuse committed by Defendant's father against Defendant's sisters for use in the penalty phase of the trial; (10) the trial court erred by denying Defendant's special jury instruction request to charge the jury on the presumption that any sentence imposed for the first degree murder conviction would be carried out according to the laws of this State; (11) myriad aspects of Tennessee's

death penalty statutes and procedure are unconstitutional in general and as applied to Defendant; (12) the trial court imposed an excessive sentence in both length and manner of service relative to the sentences for filing a false report and abuse of a corpse; and (13) the cumulative effect of these errors violated Defendant's right to due process. As an additional issue, Defendant alleges that the trial court erred by denying his petition for writ of error coram nobis. Following oral argument at the Cecil C. Humphreys School of Law at the University of Memphis and this court's full consideration, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ. joined.

Steven C. Bush, District Public Defender; Phyllis Aluko and Barry Kuhn, Assistant Public Defenders (on appeal); Gerald Skahan, Larry Nance, and Kindle Nance, Assistant Public Defenders (at trial), for the appellant, James Hawkins.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; Amy P. Weirich, District Attorney General; Patience Branham, Marianne Bell, Jennifer Nichols, and Danielle McCollum, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Procedural History**

On September 11, 2008, the Shelby County Grand Jury indicted Defendant, James Hawkins, for the premeditated first degree murder of his girlfriend, Charlene Gaither, for initiating a false report relative to her disappearance, and for abuse of a corpse. The State filed a notice of its intention to seek the death penalty as to the first degree murder charge, relying upon two aggravating circumstances: that Defendant was previously convicted of felonies involving the use of violence, Tennessee Code Annotated section 39-13-204(i)(2), and that Defendant knowingly mutilated the victim's body after death, Tennessee Code Annotated section 39-13-204(i)(13). On June 10, 2011, a Shelby County Criminal Court jury convicted Defendant of premeditated first degree murder, initiating a false report, and abuse of a corpse. On June 11, 2011, the jury sentenced Defendant to death for the first degree murder conviction, finding beyond a reasonable doubt the existence of both aggravating circumstances and that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

Following the trial court's denial of Defendant's motion for new trial, Defendant filed a timely notice of appeal to this court.

While the appeal was pending before this court, Defendant filed a petition for writ of error coram nobis in the trial court, alleging that newly discovered evidence warranted the reversal of the conviction and death sentence. This court stayed all appellate proceedings pending the resolution of the petition for writ of error coram nobis in the trial court. *See State v. Mixon*, 983 S.W.2d 661 (Tenn. 1999). On April 25, 2014, the trial court denied coram nobis relief. Defendant filed a timely notice of appeal from the denial of coram nobis relief and, on June 2, 2014, this court consolidated the appeals with this case becoming the primary case number for appellate review. *State v. James Hawkins*, W2012-00412-CCA-R3-DD, W2014-00981-CCA-R3-ECN (Order) (Tenn. Crim. App., at Jackson, June 2, 2014).

## Factual Background

On February 12, 2008, Officer Kimberly Houston of the Memphis Police Department (MPD) interviewed Defendant at an apartment, referred to as Prince Rupert No. 4, concerning a missing person report he had made regarding his girlfriend, Charlene Gaither. Ms. Gaither was the mother of Defendant's three children, K.T., J.W.I., and J.S.I. (we will refer to child witnesses by their initials). K.T., a daughter, was 12 years old at the time of the victim's disappearance. J.W.I., an older son, was 11 years old, and J.S.I., a younger son, was 9 years old. Officer Houston recalled seeing mothballs scattered near the entrance to the apartment at the time of her initial interview of Defendant. Defendant explained that the mothballs were to repel cats. Officer Houston noticed a very strong odor of ammonia emanating from the apartment, so strong that her eyes watered as she stood in the open doorway to interview Defendant. Defendant explained that one of the children had spilled bleach inside the apartment. Regarding his girlfriend's disappearance, Defendant told Officer Houston that Ms. Gaither left the apartment at 9:00 a.m. on Saturday, February 9, 2008, after the two had "an altercation." Officer Houston recalled that Defendant's daughter, K.T., seemed angry during the interview with Defendant. She said that K.T. did not divulge any information when asked by Officer Houston if there was a problem. Officer Houston recalled that Defendant seemed "calm but just confused" during their conversation.

On the afternoon of February 14, 2008, Lance McCallum, an employee with the Mississippi Department of Transportation, was patching holes on the Coldwater River bridge on Highway 78 when he glanced down the embankment below the bridge and saw "[a] body with the hands cut off above the wrist, both feet cut above the ankles, and the head and neck removed." He determined that the body, which was nude and lying on its

back, was an adult female. Mr. McCallum and his coworkers immediately telephoned 9-1-1. The authorities arrived within minutes.

Detective Mike Pate of the DeSoto County Mississippi Sheriff's Department responded to the call of the body's discovery. Detective Pate recalled that the body appeared to have been dropped from the top of the hill and rolled down the embankment. He observed that the body had three very deep cuts "to the bone" on the thigh, knee, and mid-shin of the right leg. An examination of the body revealed no stab or gunshot wounds. DeSoto County authorities searched the area for the missing body parts but were unable to locate them. Because of the condition of the body, Detective Pate was unable to make an initial identification. On February 15, 2008, after speaking with MPD investigators concerning the missing person report filed by Defendant, Detective Pate collected a buccal swab from Ms. Gaither's mother, Jerilene Irvin. Deoxyribonucleic analysis (DNA) later confirmed the body to be that of the victim, Charlene Gaither.

On February 15, 2008, then-Lieutenant Toney Armstrong of the MPD contacted the DeSoto County Sheriff's Department concerning the discovery of a body and determined that the body fit the description of the missing person in the report filed by Defendant. Lieutenant Armstrong contacted Defendant to ask him to come to the police station for an additional interview. Lieutenant Armstrong recalled that Defendant became "very defensive" and told Lieutenant Armstrong that he could not come to the station until he completed his shift at the Nike Store. Lieutenant Armstrong and other investigators decided to locate Defendant at his apartment later that afternoon. He testified at trial that when they spoke to Defendant at the apartment complex that day, Defendant "seemed extremely agitated to talk to us, almost to a paranoid state." He recalled a strong odor of bleach emanating from the apartment and Defendant's explanation to investigators that he had been cleaning. While other MPD investigators transported Defendant to the police station for further questioning, Lieutenant Armstrong secured the scene and obtained a search warrant for the apartment.

Crime Scene Investigator Jeffrey Alan Garey assisted in the search of the apartment on February 15 and 16, 2008. He noticed "a strong smell of bleach" in the apartment, particularly in the hallway bathroom, master bedroom, and master bathroom areas of the residence. Investigator Garey used luminol to detect the presence of any blood evidence that could not be visually seen. The luminol testing revealed the presence of blood on the bed rail in the master bedroom. Further testing in the bathroom produced "an immediate bright blue reaction throughout eighty percent of the bathroom." He testified that an adverse effect of luminol testing to locate blood evidence is the degradation of DNA from the blood evidence once revealed. Investigator Garey documented scrape marks across the kitchen floor that appeared to have been made by

moving a large appliance through the kitchen. Across the hall in an unlocked vacant apartment, Investigator Garey observed an unplugged upright freezer with a "very strong odor of bleach" that he described as "extremely clean." He recalled that all of the shelving in the freezer had been pushed to the top.

MPD Sergeant Anthony Mullins located Defendant at the apartment on February 15, 2008. He recalled that, although Defendant seemed very nervous and was "visibly shaking," Defendant agreed to speak to the officers concerning the missing person report he had filed days earlier. Sergeant Mullins testified that once Defendant's three children were placed in the care of family members, Defendant went willingly with investigators to the station for further questioning. Sergeant Mullins testified that Defendant was not under arrest at the time but that Defendant was transported to the station in a police cruiser. At the station, investigators placed Defendant in an interview room. Defendant was not handcuffed during questioning on February 15.

On the evening of February 15, 2008, Defendant gave a statement denying knowledge of the victim's location. Defendant told investigators that he and the victim had an argument because the victim had suspected him of "cheating." Defendant told investigators that the victim left the apartment at approximately 9:00 a.m. on Saturday, February 9. Defendant told investigators that J.S.I. told Defendant that he had seen the victim leaving in a dark-colored car driven by a light-skinned woman. Defendant claimed to have spoken to the victim on Sunday, February 10. He said that the victim had telephoned him to let him know that he could raise the children. Defendant told investigators that the victim and their children had lived in the apartment for three to four weeks but that he had only moved there two weeks before the victim's disappearance. Defendant explained that a piece of missing carpet in the master bedroom had been missing since he had lived there.

Unbeknownst to Defendant, other investigators were interviewing the children while Defendant gave his initial statement. Noting several inconsistencies between the children's and Defendant's statements, investigators decided to detain Defendant on a "48 hour investigative hold." Sergeant Mullins testified that the "hold" is an option utilized when "we believe we have probable cause that we could charge somebody with a crime but we're not prepared to do so" and need additional time to "confirm or deny" the inconsistencies in the statements. In the early morning of February 16, 2008, Defendant was booked into the jail on a first degree murder "hold."

On February 16, 2008, Sergeant Mullins assisted in a search of the apartment where he observed evidence of heavy cleaning in the hallway bathroom, drag marks on the kitchen floor, and an unplugged freezer that appeared to have been moved to the

vacant apartment across the hallway. He testified that the hallway bathroom contained a bathtub while the master bathroom contained only a shower. Sergeant Mullins testified that investigators were unable to locate any additional evidence from area garbage dumpsters. Investigators did, however, locate a Craftsman skill saw at a nearby Kmart that the children reported Defendant had purchased and then returned to Kmart later on the day of the victim's disappearance. In addition to the skill saw, investigators retrieved video surveillance footage showing Defendant and the children at the Kmart on February 9, 2008.

After confirming various aspects of the children's statements, investigators initiated an interview with Defendant on the evening of February 16, 2008. Sergeant Mullins testified that because Defendant was then under arrest on the 48-hour hold, he advised Defendant of his *Miranda* rights before initiating the interview. Defendant refused to sign the rights waiver, while "emphatic[ally]" stating that he understood his rights and would agree to give a statement. During the interview, Defendant denied (1) throwing out a mattress from the master bedroom; (2) owning a freezer; and (3) that the carpet in the master bedroom had been cut. Sergeant Mullins recalled that Defendant tried to be cooperative during the interview but at times would turn away, refusing to respond to questions.

MPD Sergeant Caroline Mason testified that, while walking Defendant back to the jail, Defendant told her that he wanted to talk outside an interview room. Investigators returned Defendant to the upstairs office area where Defendant once again refused to sign a rights waiver form after being advised of his *Miranda* rights. Defendant, nevertheless, offered a third statement concerning the victim's disappearance. Defendant told investigators that "he did not want his daughter to go to jail, he was trying to cover for his daughter." He reported that K.T. stabbed the victim and that he had held the victim for 30 to 60 minutes while she died. Defendant said that he moved the victim to the bathtub in the hallway bathroom where he dismembered the victim. He said that he and K.T. then drove to Mississippi where he disposed of the victim's body and body parts in separate areas off Highway 78. Defendant agreed to guide investigators to the locations where he had abandoned the victim's body parts. Efforts to locate the body parts, however, were futile due to heavy rains that had occurred in the days following the victim's death.

Sergeant Mason testified that she accompanied Sergeant Mullins to the apartment on February 15, 2008, to gather a more detailed statement from Defendant regarding the missing person report. Later that evening at the police station, Sergeant Mason interviewed J.S.I. in the presence of J.S.I.'s maternal grandfather, Louis Irvin, Jr. Based upon discrepancies between Defendant's statement and those of the children, investigators

arrested Defendant on a 48-hour hold in the early morning of February 16. On February 16, 2008, Sergeant Mason assisted in the search of the apartment. She recalled seeing a pair of children's panties on top of a pair of dark blue pajama bottoms on the master bedroom floor. On the evening of February 16, Sergeant Mason assisted in the second interview of Defendant. She testified that Defendant refused to sign a rights waiver form but affirmed that he understood his rights and agreed to talk to investigators. She recalled that Defendant controlled the interview by participating at times and then refusing to answer questions. She said that Defendant denied involvement in the victim's disappearance. On the return walk to the jail, however, Defendant stopped Sergeant Mason and said, "I didn't do it. I didn't do it, but I may have covered it up." Defendant agreed to return to the investigator floor of the building to give a statement.

During the third interview, Defendant once again refused to sign a rights waiver. Investigators agreed to interview Defendant in an office area because Defendant expressed reservations about being surreptitiously recorded in an interview room. Sergeant Mason explained that, although the MPD does not record suspect or witness interviews, Defendant was fearful of being included in an episode of the crime documentary television show, "The First 48." Defendant told investigators that he had taken the children to a movie on Friday, February 8, while the victim stayed home. When they returned, the boys went to bed, and he and K.T. went to the living room to watch television. He told investigators that the victim woke up and "fussed" at him about K.T. staying up late. He claimed that he fell asleep in the living room.

Defendant told investigators that he awoke on Saturday morning to the victim and K.T. arguing. He went to the master bedroom to see K.T. holding a knife. As he approached K.T. to stop her, K.T. stabbed the victim in the neck. Defendant said that he held the victim for one to two hours until she died. He claimed that K.T. said, "Daddy, you [have] got to help me cover this up, I don't want to go to prison for the rest of my life." Defendant told investigators that he then decided to dismember the victim and dispose of her body in Mississippi. At the conclusion of the interview, Defendant agreed to show investigators the locations where he had disposed of the victim's body parts.

On February 17, 2008, Sergeant Mason interviewed K.T. regarding the victim's disappearance. Sergeant Mason testified that K.T. had not been "forthcoming" during her first statement on February 15, but two days later, K.T. spoke openly with investigators during her second statement. Sergeant Mason recalled K.T.'s telephone ringing during the interview. K.T. answered and became nervous because it was Defendant telephoning her from the jail. K.T. hung up on Defendant, but he called back three times. Sergeant Mason testified that K.T. seemed nervous but was reassured after being told that Defendant was in the jail. Following K.T.'s statement, Defendant was formally charged with the victim's murder.

Sergeant Vivian Murray participated in K.T.'s February 17 interview. She recalled Defendant's calling K.T.'s telephone from the jail. Sergeant Murray testified that she answered the telephone and that Defendant said, "Bitch, don't talk to my daughter" and hung up the phone.

At trial, the parties stipulated that the victim died as a result of "stabbing, strangulation or a combination of both." Doctor Qadriyyah Debnam, a Special Agent Forensic Scientist with the Tennessee Bureau of Investigation, performed DNA and serology analysis on items collected from the apartment and the trunk of the victim's car. Samples of carpeting from the victim's trunk and one freezer tray revealed the presence of the victim's blood. Doctor Steven A. Symes, a forensic anthropologist, testified that the cuts to the victim's body were consistent with having been made with a "typical seven and a quarter inch circular saw blade." He determined that the three cuts to the victim's right leg were "abandoned" because the saw could not cut through that particularly large section of the leg. The saw was capable, however, of cutting the wrists, ankles, and neck.

At trial, Louis Irvin, Jr., the victim's father, testified that Defendant was the father of the victim's children. He testified that Defendant had been absent from the family for some time but that Defendant returned in the fall of 2007. Mr. Irvin testified that the victim soon "broke communications" with him after Defendant began living with the victim and the children. Mr. Irvin recalled the victim's being bothered by the attention Defendant paid to K.T. He recalled that Defendant and K.T. "stayed off to themselves" at family gatherings, but he assumed that it was because Defendant had been absent for so long.

Angela Hilton testified that she had worked with the victim at the Tipton County Adult Development Center, where the victim worked with the "most severe[ly]" handicapped patients. She recalled that the victim was an "extraordinary" employee who only missed work when her children were sick. Ms. Hilton last saw the victim in November 2007. She said that the victim did not show up for the office Thanksgiving party. She knew that the victim had moved to Memphis with Defendant, and she assumed that the drive to Tipton County became burdensome for the victim.

MPD Officer Nancy Trentham testified that she responded to a call at 3461 Wingood Circle on January 12, 2008, where she spoke to the victim, who was standing outside the apartment with her two sons. The victim wanted K.T. to leave with her and her sons. The victim told Officer Trentham that she suspected "something inappropriate was going on" between Defendant and K.T. Officer Trentham and another officer spoke

to Defendant. She described Defendant as "very cooperative . . . polite . . . [and] very calm." She spoke to K.T. privately in another room of the apartment. She described K.T. as "very quiet" and "very soft spoken." After speaking to all the parties, Officer Trentham advised the victim that she could not force K.T. to leave because there was no custody arrangement between the parents. The victim became very upset and repeated her suspicion that something inappropriate was happening between Defendant and K.T. Officer Trentham completed a memorandum to the Child Advocacy Center, but she did not refer the victim for an order of protection because she saw no signs of abuse, domestic or otherwise, during the call to the residence.

Melvin Gaither was married to the victim from 2003 until 2007. He testified that Defendant and the victim renewed their relationship in late-September 2007. He recalled that Defendant helped move the victim and the children from his home on October 18, 2007. On Christmas Day 2007, the victim contacted Mr. Gaither and told him that Defendant had been threatening her. On January 5, 2008, the victim told Mr. Gaither that she needed to get away from Defendant, stating "I believe he wants to kill me." Mr. Gaither spoke to the victim in person once more on January 16, 2008, when she told him that Defendant was threatening her again and that the children would not leave with her.

Shannon Hein, the keeper of records at Methodist LeBonheur Children's Hospital, testified that K.T. was hospitalized from December 26-27, 2007, after suffering a miscarriage. The medical examination revealed that K.T. was 10 weeks pregnant. K.T. reported to the medical staff that she had consensual sex with a classmate from school and was unwilling to discuss the pregnancy any further.

Milton Harris was married to the victim from 1998 until 2002. He testified that he and the victim remained friends after their divorce. In January 2008, the victim met him at a Pizza Hut. He recalled that the victim had her sons with her but that she was "hysterical" and "very upset" because she had left K.T. with Defendant. Mr. Harris testified that he talked to the victim the next day, and the victim told him that K.T. was now with her. Several days later, the victim showed up at FedEx, where Mr. Harris worked, with her three children. Mr. Harris recalled that the victim was "really terrified" and "wanted to leave" Defendant. Mr. Harris gave the victim keys to an old apartment, Prince Rupert number 4, that he still had leased and gave her money to file a restraining order against Defendant.

Deborah Coffman, an employee with Citizens Dispute, testified that, on January 15, 2008, she assisted the victim in preparing an application for an order of protection. By that time, the victim had changed residences and moved to the Prince Rupert apartment. The victim listed Defendant's address as the apartment located at Wingood

Circle.  The victim reported that on January 12, 2008, Defendant became violent and pulled her hair when she informed him that she and the children were leaving.  The victim told Ms. Coffman that Defendant had been sleeping in the same bed with K.T., although both Defendant and K.T. denied any sexual abuse was occurring.  The victim told Ms. Coffman that she wanted Defendant to "just stay away."  Several weeks after assisting the victim, Ms. Coffman learned that the victim had been killed.  Ms. Coffman testified that the ex parte order of protection had never been served on Defendant and that the case had been dismissed on January 29, 2008.

J.W.I. was eleven years old when the victim died.  He testified at trial that he was attending the fifth grade in Covington, Tennessee in the fall of 2007.  He lived with the victim, his siblings, and Melvin Gaither.  He moved to Memphis when the victim reunited with Defendant.  J.W.I. said that "everything was simple and quiet" at first when Defendant returned.  He soon noticed, however, that Defendant paid more attention to K.T. and that his parents argued about the attention Defendant paid to K.T.  During one argument, the victim threatened to telephone the police, and Defendant "snapped" the victim's cellular telephone.  During another argument, the victim woke the children, and they left the apartment.  The victim and the children waited in the FedEx parking lot until Milton Harris could bring the victim keys to the Prince Rupert apartment.  J.W.I. recalled another argument, which occurred at the Prince Rupert apartment, during which he heard a slap and later saw the victim's face was red.

Regarding Defendant's relationship with K.T., J.W.I. testified that some time after Christmas 2007, Defendant told J.W.I. and J.S.I. to stay in the living room while Defendant took K.T. to another room.  J.W.I. testified that when he left the living room to look for batteries, "out of the corner of my eye I could see [Defendant] on top of my sister."  Defendant scolded J.W.I. for leaving the living room.  J.W.I. testified that he never discussed with anyone what he had witnessed until after the victim's death.

J.W.I. testified that on the day of the victim's death, K.T. came to the children's bedroom and told them to stay in the room and turned up the television "as loud as it could go."  J.W.I. never saw the victim that day.  After K.T. returned to the bedroom and turned down the television, Defendant told the brothers that the victim "was gone" and that she had left during the night.  J.W.I. thought at the time that "something was wrong because [the victim] wouldn't just up and leave like that."  That afternoon, Defendant drove the children to a discount store for cleaning supplies and to Kmart to purchase a saw.  Defendant instructed the boys to sit in the car, claiming that he had a surprise for them.  The brothers sat outside in the car for approximately three hours before being allowed to return to the apartment.  They then helped Defendant clean the apartment but were forbidden from going into the hallway bathroom.  They helped Defendant dispose

of the master bedroom mattress and box spring set. J.W.I. also recalled that when he was allowed into the apartment, the upright freezer was missing. Defendant told him that he had moved the freezer out of the apartment because it was broken. J.W.I. identified at trial the surveillance video from Kmart showing Defendant's purchasing and returning the saw. J.W.I. learned approximately a week later that his mother had been killed.

J.S.I. was nine years old when the victim died. He testified that Defendant lived "briefly" with him, his mother, and his siblings when he was in the fourth grade. He recalled that for the first two to three weeks of Defendant's return, "it was nice." He soon noticed, however, that Defendant showed little attention or affection to himself or J.W.I. He testified that he saw Defendant "tongue kissing" his sister, but he did not tell anyone because he was scared. J.S.I. testified that the victim and Defendant fought violently at times. He recalled an incident when Defendant snapped the victim's cellular telephone after she threatened to telephone the police. He also recalled leaving the first apartment and meeting Mr. Harris for a key to the new apartment. J.S.I. testified that things were worse in the second apartment and that he thought Defendant had slapped the victim once during an argument. J.S.I. recalled that K.T. "would get beat[en]" if she disobeyed Defendant. He said that K.T.'s personality changed when Defendant began living with them and that she was often disobedient to the victim. He recalled Defendant's forbidding K.T. from talking to the victim.

Regarding the night before the victim's disappearance, J.S.I. testified that Defendant had taken the children to the movies while the victim, who was not feeling well, stayed home. When they returned home, Defendant and the victim argued throughout much of the night. J.S.I. recalled hearing the victim say at least four or five times, "[K.T.]'s my baby." The next morning, K.T. told the boys to stay in their bedroom, and she turned up the television. J.S.I. could hear the victim yelling and then heard nothing. He looked out the window and saw a car with dark-tinted windows leaving the parking lot. On cross-examination, J.S.I. admitted telling Sergeant Mason that he thought the victim left in the car, but he explained that he later learned that he was mistaken. He left the bedroom, and Defendant told J.S.I. that he and the victim had been arguing again and directed J.S.I. to go back to bed. Later that day, Defendant took the children to Kmart where he purchased a saw. J.S.I. waited outside for three hours while Defendant and K.T. were inside the apartment. J.S.I. went to the apartment once to use the bathroom, and Defendant directed him to the master bathroom. When he was leaving the apartment, he saw a tennis shoe through the partially opened door of the hallway bathroom, but K.T. quickly shut the door before J.S.I. could see anything else. When Defendant and K.T. came outside, Defendant and the children drove around throwing black garbage bags into different dumpsters. J.S.I. recalled seeing a red liquid dripping from the upright freezer. Defendant told J.S.I. that it was Hawaiian Punch but forbade

J.S.I. from opening the freezer. Defendant moved the freezer from the apartment later that night, claiming that it no longer worked.

K.T. was twelve years old when the victim died. She testified that she lived in Covington, Tennessee with her brothers, the victim, and Mr. Gaither before Defendant's return in the fall of 2007. K.T. said that Defendant had been gone for a long time. She recalled that she saw Defendant at her aunt's house while visiting with the victim and her brothers. Defendant awakened her to watch television with him. She fell asleep in the living room and awoke to Defendant's touching her vagina. She told him to stop but he refused. He later threatened to hurt her if she told anyone about the incident.

K.T. testified that Defendant moved the family from Covington to Memphis. She said that he "constantly" touched her on her vagina, breasts, and buttocks. He also asked her to touch his penis with her hand or her mouth. K.T. said that the touching occurred "about every other day." She said that if she protested or fought back, Defendant would force her to comply. She testified that Defendant hit her, punched her in the stomach, choked her, put a knife to her throat, and threatened to kill her.

K.T. testified that she went to the hospital after suffering a miscarriage. Defendant and the victim rode with her in the ambulance and were present when the doctors interviewed her. She never told anyone that Defendant was having sex with her. She testified that she never had sex with anyone other than Defendant. After the miscarriage, Defendant's sexual acts against K.T. continued. K.T. explained that when she was interviewed by the Child Advocacy Center, she did not disclose what Defendant was doing because he had driven her to the interview and she knew that she would be going home with him.

K.T. recalled the victim's leaving Defendant and moving the family to the Prince Rupert apartment. She said that the victim began talking to Defendant again and eventually allowed him to move back with the family. K.T. testified that the sexual abuse resumed immediately. She said that Defendant would "get crazy" when angered, so she always did what he instructed her to do.

K.T. testified that Defendant and the victim had been arguing about K.T. being up late watching television on the night of February 8, 2008. K.T. went to bed. The next morning, she awoke to the victim's and Defendant's arguing. As K.T. walked to the hallway bathroom, she saw Defendant walk from the kitchen to the master bedroom with a knife in his hand. When the victim threatened to telephone the police, Defendant bent over and stabbed the victim in the neck. K.T. testified that she just "stood in shock."

K.T. testified that Defendant ordered her to help him dismember the victim. He threatened her with a knife. She testified that she turned up the volume of the television and told her brothers to stay inside their bedroom. Defendant moved the victim's body to the upright freezer, cleaned the bedroom, and cut bloodstains from the carpet and mattress. Defendant, K.T., and her brothers went to Kmart where Defendant purchased a saw and to Family Dollar where Defendant purchased cleaning supplies. K.T. testified that Defendant disposed of the kitchen knife in a garbage can at Kmart.

When they returned to the apartment, Defendant told the brothers to wait in the car. Upstairs, Defendant moved the victim's body from the freezer to the bathtub in the hallway bathroom. Defendant taped K.T.'s hands behind her back and ordered her to turn away as he removed the victim's hands, feet, and head with the saw. K.T. testified that she held the victim's head after Defendant removed it and that Defendant ordered her to wrap the body parts in plastic garbage bags and place them in the freezer. When the boys returned to the apartment, they complained of the smell. Defendant had the children assist in cleaning the apartment. Later that afternoon, Defendant returned the saw to Kmart. During the night, Defendant asked K.T. to help him move the victim to the trunk of the car. He then drove K.T. to Mississippi where he disposed of the victim's body parts in multiple locations. While removing the victim's body from the trunk, Defendant instructed K.T. to stand by the car with the hood open and a cellular telephone in her hand in order to feign having car trouble should someone drive by. K.T. admitted that she never telephoned the police because she was scared of Defendant. She said that once Defendant was in handcuffs, she was no longer scared. She testified that, while giving her statement on February 17, she "felt like he couldn't hurt [her] anymore."

K.T. admitted to making allegations of sexual abuse when she was younger. Of the many missed opportunities she had to tell someone about Defendant's sexual abuse, she explained "[Defendant] was around and at the end of the day I had to go home with him." She testified that she told the truth during her February 17 statement because Defendant was finally "locked up." She testified that Defendant impregnated her, leading to the miscarriage, but that she told the doctors about a boy at school because Defendant was in the examination room with her.

Following a *Momon* colloquy, *Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), Defendant elected not to testify. Defendant presented no other evidence. Based upon this evidence, the jury convicted Defendant of premeditated first degree murder, initiating a false report, and abuse of a corpse.

At the sentencing phase of the trial, the State presented evidence concerning the emotional and financial strain suffered as a consequence of the victim's death. Cynthia

Guy, the victim's older sister, testified that she and her husband are raising the victim's children, along with their two children, in a two-bedroom, one-bath home. She said that K.T. attends weekly counseling appointments. Doctor Karen Elizabeth Chancellor, Chief Medical Examiner for Shelby County, testified that the wounds to the victim's body were inflicted post mortem and were consistent with wounds from a circular saw. Michelle Jones, keeper of records with the Shelby County Criminal Court Clerk's Office, testified that Defendant was previously convicted of 10 counts of aggravated robbery and 7 counts of aggravated assault. The parties stipulated to the accuracy of Defendant's prior convictions. Sheila Johnson, one of the aggravated robbery victims, testified that Defendant participated in the robbery of a Piggly Wiggly market on November 12, 1997, and that he employed a handgun during the robbery.

Defendant also presented proof at the sentencing phase of the trial. Jeannette Stanback, a mitigation investigator with the Shelby County Public Defender's Office, testified that Defendant was one of four children born to James Hawkins, Sr. ("Mr. Hawkins") and Della Thomas. Ms. Thomas had borne four other children. Mr. Hawkins had fathered "more than twenty" children. Ms. Stanback testified that the family history revealed that Defendant's father sexually abused at least five of his daughters. Ms. Stanback testified that Defendant's brother, Chris, died at the age of 15 when he was shot standing outside the apartment where Defendant and his siblings resided with their mother. Ms. Stanback testified that anecdotal reports from Defendant's family indicated that Defendant, who was 19 years old when his brother died, received no counseling concerning his brother's death and was arrested for the Piggly Wiggly robbery within one year of Chris's death. Defendant's educational records revealed that Defendant dropped out of school during the eighth grade and that intelligence quotient testing of Defendant showed a full-scale IQ of 77. Ms. Stanback testified that Defendant had been a "model inmate" while in jail awaiting trial on these charges.

Defendant's mother, Della Thomas, testified that Mr. Hawkins never supported the family financially and that he was abusive and controlling. Ms. Thomas was not aware of any allegations of sexual abuse while the children were growing up but had recently learned that two of Defendant's sisters claimed Mr. Hawkins had sexually abused them. Ms. Thomas recalled that Defendant was diagnosed with Attention Deficit Hyperactivity Disorder and was prescribed Ritalin as a child. She testified that her son Chris died in Defendant's arms and that Defendant became violent and moody after Chris's death. On cross-examination, Ms. Thomas testified that she raised her children and that Mr. Hawkins was "out of the picture" during most of their childhoods.

Following a full *Momon* colloquy, *id*., Defendant elected not to testify during the sentencing phase. The State presented rebuttal evidence from Keely Gray, a Shelby County Sheriff's Department jailer, who testified that Defendant had received a sanction for noncompliance when he refused a staff order. Although Defendant did not have a disciplinary hearing, he did spend time in "lock down" due to the sanction. Following deliberations, the jury found beyond a reasonable doubt the existence of both aggravating circumstances and that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

At hearings concerning Defendant's petition for writ of error coram nobis, Defendant presented two instances of allegedly newly discovered evidence: (1) that previously undisclosed DNA testing performed on the fetal tissue taken from K.T.'s miscarriage excluded Defendant as the father of K.T.'s child, and (2) that the State concealed instances of sexual abuse committed by Defendant's father that would have been relevant to mitigation during the sentencing phase of the trial. As to the DNA testing, the trial court found that the evidence would not result in a different outcome had it been presented at trial because the testing results were inconclusive as to the paternity of the fetal tissue. As to the evidence of sexual abuse committed by Defendant's father, the trial court found that such evidence was, in fact, presented at the sentencing phase of the trial and that the State's subsequent indictment of Defendant's father was of no consequence to the outcome of the sentencing phase.

## ANALYSIS

### GUILT-INNOCENCE PHASE ISSUES

*Suppression of February 16 Statement*

In his initial issue on appeal, Defendant contends that the trial court erred by denying his motion to suppress his statements made to investigators on February 16, 2008, wherein he admitted to dismembering the victim's body. He argues that he was illegally detained without a warrant and without probable cause when approached by officers on February 15 at 4:15 p.m. or, alternatively, that he was illegally detained without a warrant and without probable cause when booked on a 48-hour investigative hold at 1:59 a.m. on February 16. Thus, he argues that his statement made to investigators on the evening of February 16 should be suppressed as fruit of the poisonous tree flowing from the illegal detention. For the first time on appeal, Defendant also raises, as plain error, that the delay in taking him before a magistrate should result in the suppression of his February 16 statement.

The State contends that the trial court correctly denied Defendant's motion to suppress. The State argues that the evidence does not preponderate against the trial court's finding that Defendant accompanied investigators voluntarily to the police station on the evening of February 15 and that Defendant's detention on February 16 was supported by probable cause relative to initiating a false report. Further, the State argues that the February 16 statement was voluntarily and knowingly given after receiving full *Miranda* advice. As to Defendant's claim that his statement should be suppressed due to a delay in taking him before a magistrate, the State argues that this issue does not rise to the level of plain error because a clear and unequivocal rule of law has not been breached because Defendant made the statement within the first 48 hours of his detention.

Three Memphis Police Department investigators, two of whom were called by the State, testified at the hearing on Defendant's motion to suppress evidence. No other person, including Defendant, testified at the hearing. The following is a summary of the evidence presented at the suppression hearing. Lieutenant Armstrong wanted to talk to a man who at the time was a witness relative to the missing person report concerning the victim in this case. When the witness failed to drive to the police department to give a statement when he was asked to do so, Lieutenant Armstrong ultimately dispatched at least three investigators in unmarked police vehicles to the area of the apartment where the witness resided. Lieutenant Armstrong instructed investigators to look for the vehicle used by the witness and to prevent the witness from leaving the premises. The testimony indicated, however, that investigators were not authorized to knock on the witness's apartment door in order to obtain a statement from the witness.

While parked at the apartment complex watching the witness's vehicle, investigators observed the witness and his children getting into the car and driving away. Investigators followed the witness toward the exit of the apartment complex. Soon the witness turned around and started back in the direction of his apartment. Investigators then "turned on the blue lights to get [the witness] to stop."

Upon making contact with the witness, investigators told the witness that he must go downtown to the police department in order to give a statement concerning the missing person report. The witness, however, wanted to give his statement at his apartment. Investigators told the witness this was not possible. Investigators permitted the witness and his children to return to the apartment to await the arrival of an adult to watch the children. The witness had earlier expressed concerns about going to the police department to give a witness statement because he had no one to stay with his three minor children.

Lieutenant Armstrong drove to the witness's apartment with an adult relative of the children to alleviate the witness's concern by providing a caregiver for the children. Investigators required the witness to ride in a police vehicle to go to the police department. However, he was not driven in one of the unmarked investigators' vehicles. A "uniform patrol car" was dispatched to transport the witness, who was placed into the back seat, to the police department.

According to investigators, the witness was clearly not a suspect in any criminal activity, and the officers had absolutely no legal grounds to arrest the witness. Nevertheless, investigators stopped the witness by "blue lighting" the witness at approximately 4:15 p.m. on Friday, February 15, 2008. Investigators transported the witness in a marked patrol car and placed him in an interview room at the police station at approximately 5:30 p.m. The interview room's door locked so that a person inside could not exit the room without a key. In other words, the witness was not free to leave the interview room. Investigators entered the interview room at 6:00 p.m. and left at 6:24 p.m. Investigators did not return to the interview room until 7:24 p.m. It is undisputed through the sworn testimony of investigators that throughout this time period the witness was not a suspect in any criminal activity – therefore, according to investigators, there were no legal grounds to hold the witness in custody.

On the evening of Friday, February 15, 2008, the witness gave a non-incriminating statement, which was typed by investigators and later signed by the witness, denying any knowledge of the victim's disappearance or whereabouts. However, with multiple breaks in the interview process taken by investigators, the statement was not signed until approximately 10:00 p.m. At one point during the interview, the witness stated that he wanted to go home, as he had provided all the information he could. Investigators then told the witness that he could not leave because they wanted to ask him some more questions. Investigators determined subjectively that the witness was not "adamant" enough in his request to be allowed to leave, so they kept the witness in the locked interview room for some additional time period. The person who is described herein and who investigators referred to as being only a "witness" is Defendant.

Additional evidence presented at trial showed that Defendant filed a missing person report with MPD on February 12, 2008. On that day, Officer Houston went to the Prince Rupert apartment to interview Defendant. Officer Houston recalled smelling a strong odor of mothballs and ammonia, forcing her to stand in the doorway for the interview. On February 14, 2008, an initially unidentifiable female body, without hands, feet, or a head, was discovered in Mississippi. When the victim's family inquired with MPD about the possibility of the unidentified body being the victim, investigators decided

to contact Defendant in order to follow up on the missing person report that Defendant filed on February 12.

In his February 15, 2008 statement to investigators, Defendant denied any knowledge of the still unidentified body discovered in Mississippi. Defendant offered a detailed account of the last time he saw the victim alive on February 9, 2008. On February 15, investigators also interviewed J.S.I. and J.W.I., who gave statements consistent to each another but different from Defendant's account of the events leading up to the victim's leaving. The children also offered detailed accounts of Defendant's and the children's activities on the weekend of the victim's disappearance. When confronted with statements made by the children, Defendant denied any knowledge of the events reported by the children. On the evening of February 15, investigators searched the apartment and found evidence of heavy cleaning and removal of a piece of carpeting and a freezer from the apartment, confirming various aspects of the children's statements and refuting Defendant's denials. We note that the search of the apartment and admission of evidence from that search has not been challenged by Defendant. At 1:59 a.m. on February 16, 2008, investigators arrested Defendant on a 48-hour investigative hold for suspicion of first degree murder.

On February 16, following further investigation and a second search of the apartment, investigators initiated a second interview with Defendant. This time investigators advised Defendant of his *Miranda* rights. Although Defendant refused to sign a waiver of rights form, he agreed to speak to investigators. During the first interview on February 16, Defendant continued to deny any knowledge of the victim's whereabouts. While being walked back to the jail, however, Defendant spontaneously said, "I didn't do it, but I know who did." Defendant agreed to speak with investigators, reportedly saying, "I'll talk to you, but not in the [interview] room." Following an additional *Miranda* advice, Defendant told investigators that he had assisted in covering up the victim's murder after K.T. killed the victim. Defendant admitted to dismembering the victim's body and disposing of her body in various locations in Mississippi. Defendant then guided investigators to the areas where he had discarded the body, but investigators were unable to locate the victim's missing limbs and head.

At the conclusion of the hearing, the trial court found that the initial encounter between investigators and Defendant on February 15 was consensual and that Defendant voluntarily accompanied the investigators to the police station to give a statement concerning the missing person report. The court found that the February 15 statement occurred within a noncustodial setting and that Defendant voluntarily remained at the police statement even when informing investigators that he had nothing more to tell them.

As to the statements made on February 16, the trial court found that Defendant's admissions in the hallway while being returned to the jail were "spontaneous utterances" that did not occur during interrogation and, therefore, did not require *Miranda* warnings. The trial court further found that the investigators "covered [Defendant's] rights, backwards and forwards," that Defendant understood his rights, and that the statements were made voluntarily while being lawfully detained based upon probable cause to believe Defendant had committed abuse of a corpse. The trial court made no specific findings relative to whether Defendant was illegally detained by the officers' February 15 stop by activating the "blue lights" on their vehicle.

In *Echols*, our Supreme Court set forth the following standard of review for suppression hearings:

> [T]he standard of review applicable to suppression issues is well established. When the trial court makes findings of fact at the conclusion of a suppression hearing, they are binding upon this Court unless the evidence in the record preponderates against them. Questions of credibility of witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence* adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

> Our review of a trial court's application of the law to the facts is de novo with no presumption of correctness. Further, when evaluating the correctness of the ruling on a motion to suppress, appellate courts may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial.

*State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (emphasis added) (citations omitted). Because the State prevailed at the suppression hearing in this case, we afford the State the strongest legitimate view of the evidence.

Defendant contends that he was illegally seized without a warrant on the afternoon of February 15, 2008. The State argues that the trial court correctly found that Defendant voluntarily accompanied investigators to the police station on the afternoon of February 15, 2008 and, therefore, no illegal seizure occurred.

There are three levels of police-citizen interactions: (1) a full-scale arrest, which must be supported by probable cause in order to be valid; (2) a brief investigatory detention, which must be supported by a reasonable suspicion, based upon specific and articulable facts, of criminal wrong-doing; and (3) a brief "encounter," which requires no objective justification. *State v. Day*, 263 S.W.3d 891, 901 (Tenn. 2008). The definitive test for determining whether a seizure has occurred under article I, section 7 of the Tennessee Constitution is "whether, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave.'" *State v. Randolph*, 74 S.W.3d 330, 336 (Tenn. 2002) (quoting *State v. Daniel*, 12 S.W.3d 420, 425 (Tenn. 2000)). As this court has stated, this determination requires the court to "examine[] the circumstances from the standpoint of the citizen, not the police officer. If a reasonable person would not feel free to leave due to an officer's show of authority, that constitutes a seizure, regardless of why the officer made the show of authority." *State v. Gonzales*, 52 S.W.3d 90, 97-98 (Tenn. Crim. App. 2000). Our supreme court "has adopted a totality of the circumstances test for determining whether a seizure has occurred." *State v. Moats*, 403 S.W.3d 170, 182 (Tenn. 2013) (citing *Daniel*, 12 S.W.3d at 425). As explained in *Daniel*,

> Some of the factors which are relevant and should be considered by courts when applying this totality of the circumstances test include the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

*Id*. at 425-26. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id*. at 424. The activation of blue lights will often constitute a seizure because "the lights convey a message that the occupants are not free to leave." *State v. Williams*, 185 S.W.3d 311, 316 (Tenn. 2006).

We note that the trial court did not make any explicit finding of the credibility of the testimony of the three investigators who testified at the suppression hearing, but we are comfortable concluding that the trial court implicitly accredited their testimony. That being said, we must respectfully disagree with the trial court's determination that Defendant voluntarily accompanied investigators to and remained at the police station on the afternoon and evening of February 15. The evidence simply preponderates against such a finding. Defendant ignored investigators' first request to meet at the police station. Once stopped, Defendant indicated a desire to speak only at the apartment, but

investigators told him that was not possible.  Investigators accompanied Defendant to the apartment to wait on the arrival of childcare, which was arranged by Lieutenant Armstrong.  Defendant appeared nervous and did not want to go to the police station. Despite this, Defendant was compelled to ride in the back seat of a uniform patrol car to the police department.  When he arrived at the police department, investigators secured Defendant in a locked interview room for several hours while sporadically interviewing him throughout the evening of February 15.

If we assume that the Memphis Police Department's officers treat all "witnesses" who are not suspected of any criminal activity to this type of seizure and detention without even reasonable suspicion of criminal activity, as testified to by investigators in this case, it would be no surprise that witnesses are reluctant to come forward and participate in any police investigation conducted by the department.  A witness has the same basic constitutionally protected rights as a person suspected of criminal activity. Thus, whether Defendant is characterized by investigators as either a witness or a suspect, we conclude that Defendant was seized and detained at the time investigators activated their blue lights to stop Defendant.  *Williams*, 185 S.W.3d at 318.  This seizure was done when, according to the testimony of the police officers, Defendant was only a "witness" and was not a suspect in *any* criminal activity.

Having determined that an illegal seizure occurred, we must now determine whether Defendant's statements made on February 16, 2008, should be excluded as fruit of the illegal seizure.  Our determination requires an examination of whether Defendant's February 16 statements were "sufficiently an act of free will to purge the primary taint" of the February 15 illegal seizure.  *Wong Sun v. U.S.*, 371 U.S. 471, 486, 83 S.Ct. 407, 406 (1963).  In *Brown v. Illinois*, 522 U.S. 590, 95 S.Ct. 2254 (1975), the Supreme Court outlined the factors to be considered when determining whether a statement obtained following an illegal arrest should be suppressed:

> The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained in exploitation of an illegal arrest.  But they are not the only factor to be considered.  The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Brown*, 522 U.S. 590 at 603-04, 95 S.Ct. at 2261-62.

At the outset, we must note with disapproval the policy of the MPD that is evidenced by the testimony of investigators concerning the use of a 48-hour investigative

ˇ21ˇ

hold when "we believe we have probable cause that we could charge somebody with a crime but we're not prepared to do so." This testimony acknowledges that the MPD has regularly employed a method of investigatory detentions that is unconstitutional, unless the detention is otherwise supported by probable cause. *State v. Bishop*, 431 S.W.3d 22, 43, n.9 (Tenn. 2014) (citations omitted) (stating that "[i]f the Memphis Police Department is, in fact, arresting suspects without probable cause and using this 48-hour hold procedure to gather 'additional evidence to justify the arrest,' this procedure clearly runs afoul" of constitutional precedent concerning illegal detentions). However, it matters not whether the arresting officers themselves believed that probable cause existed. *State v. Huddleston*, 924 S.W.2d 666, 667 (Tenn. 1996) ("[An officer's] objective belief that he did not have enough evidence to obtain a warrant is irrelevant to whether or not probable cause actually existed.").

Accordingly, we agree that the record supports the trial court's determination that, by 1:59 a.m. on February 16 when investigators arrested Defendant on a 48-hour investigative hold, there existed probable cause to arrest Defendant for abuse of a corpse, as well as initiating a false report. By that time in the investigation, investigators had obtained statements from the children and confirmed certain aspects of the statements by evidence gathered during the uncontested search of the apartment. That evidence, at a minimum, implicated Defendant in the disposal of the victim's body and cover-up of her disappearance.

Likewise, we also agree that the record supports the trial court's determinations that Defendant's statement made on the return to the jail was a spontaneous utterance and that the inculpatory statements that followed during further interrogation were made voluntarily and with full *Miranda* warnings. In our view, the evidence obtained through the children's statements, the search of the apartment, Defendant's spontaneous statements to investigators and offer of further discussion, and the voluntariness of the ensuing statements establish intervening circumstances sufficient to purge the primary taint of the initial illegal detention.

Turning now to Defendant's claim that the February 16 statement should be suppressed due to an unnecessary delay in taking him before a magistrate, *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854 (1975), Defendant acknowledges that this claim was not raised in the court below and argues that this court should grant relief via plain error. Our supreme court has held that appellate courts are not precluded from reviewing issues that are otherwise waived under the plain error doctrine. *State v. Page*, 184 S.W.3d 223, 230 (Tenn. 2006). This court may only consider an issue as plain error when all five of the following factors are met:

(1) the record must clearly establish what occurred in the trial court;

(2) a clear and unequivocal rule of law must have been breached;

(3) a substantial right of the accused must have been adversely affected;

(4) the accused did not waive the issue for tactical reasons; and

(5) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (internal quotations and citation omitted).

"The Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to the extended detention of an individual after a warrantless arrest." *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (citing *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)). A judicial determination of probable cause is generally considered "prompt" if it is made within forty-eight hours. *County of Riverside v. McLaughlin*, 500 U.S. 44, 55-56, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991).

We determine that Defendant is not entitled to relief via the plain error doctrine because he cannot establish that a clear and unequivocal rule of law has been breached. The challenged statement was given within 24 hours of his arrest on the 48-hour hold, for which we have determined that probable cause existed to charge Defendant with abuse of a corpse and initiation of a false report. As such, the detention had not yet ripened into a constitutional violation for failure to take Defendant to a magistrate. "Obviously if the statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *See Huddleston*, 924 S.W.2d at 675. Accordingly, Defendant is not entitled to relief as to this issue.

*Trial Court's Refusal to Accept Guilty Plea*

Defendant contends that the trial court abused its discretion by refusing to accept his guilty plea, made after the jury was sworn, to counts two and three of the indictment, to wit: initiating a false report and abuse of a corpse. Defendant argues that the trial court's refusal to accept the plea resulted in Defendant's being unable to exclude evidence of other acts pursuant to Tennessee Rule of Evidence 404(b), which in turn constituted a

deprivation of due process and his right to present a defense. The State argues that the trial court properly exercised its discretion in refusing to accept the plea.

After the jury was sworn, Defendant pleaded guilty to counts two and three and then, in a bench conference, asked that any evidence concerning the false report or abuse of a corpse be excluded pursuant to Rule 404(b). The trial judge declined to accept the pleas, ruling that to do so would be disruptive to the judicial process because it would require the court to engage in a full plea colloquy and 404(b) hearing after the jury had been sworn.

"The right to plead not guilty has inherently and constitutionally within it the right to plead guilty." *Lawrence v. State*, 455 S.W.2d 650, 651 (Tenn. Crim. App. 1970). "There is, of course, no absolute right to have a guilty plea accepted." *Santobello v. New York*, 404 U.S. 257, 262, 92 S. Ct. 495, 498 (1971). "When a Defendant challenges the court's failure to accept a plea, our obligation as an appellate court is to determine if an abuse of discretion occurred." *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995). An abuse of discretion occurs when "no substantial evidence supports the conclusion of the trial judge." *State v. Williams*, 851 S.W.2d 828, 830 (Tenn. Crim. App.), *perm. app. denied* (Tenn. 1992).

In *State v. Chett Allen Walker*, No. E2002-03093-CCA-R3-CD, 2003 WL 22258181 (Tenn. Crim. App., Oct. 2, 2003), *perm. app. denied* (Tenn. Mar. 8, 2004), Defendant was charged with first degree murder, setting fire to personal property, and abuse of a corpse. Prior to trial, Defendant pleaded guilty to setting fire to personal property and abuse of the corpse. Nevertheless, the trial court submitted those charges to the jury at the trial on the first degree murder charge, and the jury found the defendant guilty of all three charges. On appeal, Defendant argued that the trial court abused its discretion by refusing to accept the guilty pleas and submitting the two charges to the jury. This court concluded that no abuse of discretion occurred based upon the trial court's determination that all the charges should be submitted to the jury because they were included in one indictment and arose from the same criminal episode. *Chett Allen Walker*, at * 7. This court stated further that

> even if the trial court did abuse its discretion by refusing to accept the Defendant's guilty pleas, it is difficult to conceive of how such an error could have prejudiced the Defendant, as he was found guilty by the jury of the charges to which he intended to plea and the evidence of the other crimes would have been admissible in the trial for the first degree murder charge.

*Id.*

In *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), Defendant was charged with first degree premeditated murder, first degree felony murder, and aggravated arson and was facing the death penalty if convicted of first degree premeditated or felony murder. Defendant pleaded guilty after the jury was sworn to arson and first degree felony murder. The trial court refused to accept the pleas. Defendant maintained his guilt of arson and first degree felony murder throughout the trial, contesting only his guilt of first degree premeditated murder. Although Defendant did not raise the issue on appeal concerning the trial court's failure to accept the guilty pleas, the supreme court noted the attempted pleas and approved the verdicts of first degree murder and aggravated arson. *Hall*, 958 S.W.2d at 686 n.5.

"[A] trial judge has broad discretion in controlling the course and conduct of the trial." *See*, *e.g.*, *State v. Cazes,* 875 S.W.2d 253, 260 (Tenn. 1994). In this case, the trial court refused to accept Defendant's impromptu guilty pleas made after the jury was sworn based upon a finding that to do so would be disruptive to the proceedings and delay the progress of the trial. Furthermore, as in *Chett Alan Walker*, we observe that Defendant "was found guilty by the jury of the charges to which he intended to plea and the evidence of the other crimes would have been admissible in the trial for the first degree murder charge" as evidence of Defendant's attempts to conceal the crime. *Chett Alan Walker*, at *7. Even if Defendant had been allowed to plead guilty, evidence of the pleaded-to crimes would have been admissible in Defendant's murder trial. Accordingly, we conclude that the trial court committed no abuse of discretion by refusing to accept Defendant's guilty pleas.

*Admission of Victim's Statements*

Defendant presents three distinct arguments concerning the trial court's admission of statements made by the victim. In his first issue, he contends that the trial court erroneously admitted, via the state of mind exception to the hearsay rule, through the children's testimony statements made by the victim that she threatened to telephone the police. Tenn. R. Evid. 803(3). In his second issue, he contends that the trial court erroneously admitted, via the state of mind exception to the hearsay rule, through the testimony of Melvin Gaither statements made by the victim concerning her fear of Defendant and her belief that Defendant would kill her. Tenn. R. Evid. 803(3). In his third issue, he contends that the trial court erroneously admitted, via the public records and forfeiture by wrongdoing exceptions to the hearsay rule, statements made by the victim contained in the report and application for an ex parte order of protection. Tenn. R. Evid. 804(b)(6).

As to the first issue, the State contends that the statements admitted through the children's testimonies are not hearsay because they were offered to establish the fact that the victim communicated the threat to Defendant, thereby giving him a motive to kill the victim, and not to establish that the victim actually intended to call the police. As to the second issue, the State argues that the victim's statements to Mr. Gaither were properly admitted and "[e]ven if they were not, any error was harmless" because the statements were admissible to establish conduct by the victim consistent with her mental state concerning her efforts to move herself and the children away from Defendant. As to the third issue, the State argues that the trial court correctly applied the forfeiture by wrongdoing exception to the hearsay rule only, noting that the trial court did not admit the document via the business record exception to the hearsay rule.

Recently, in *Kendrick v. State*, 454 S.W.3d 450 (Tenn. 2015), the supreme court explained the standard of review to be utilized when addressing the admissibility of hearsay evidence:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. *State v. Gilley*, 297 S.W.3d [739,] 759-61[(Tenn. Crim. App. 2008)]. Once the trial court has made its factual findings, the next questions – whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule – are questions of law subject to de novo review. *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the hearsay rule. Tenn. R. Evid. 802.

Turning to the first issue, the trial court admitted through the children's testimonies the victim's threats, communicated to Defendant, to telephone the police. Contrary to Defendant's assertion that the statements were admitted via the state of mind exception to the hearsay rule, the record reflects that the trial court admitted these statements as non-hearsay and as probative of the effect that the victim's statements had on Defendant as the listener. This court has noted that when an extrajudicial statement is offered to prove the effect that the statement had on the listener, it is not offered as truth of the matter asserted and is, therefore, not hearsay. *State v. Carlos Jones*, No. W2008-02584-CCA-R3-CD, 2010 WL 3823028, at *14-15 (Tenn. Crim. App., Sept. 30, 2010). Accordingly, we conclude that the statements admitted through the children's testimonies were properly admitted as non-hearsay and were probative of the effect they had on Defendant as the listener.

Turning to the second issue, the trial court admitted the victim's statements made to Mr. Gaither as probative of the victim's mental state concerning her desire and efforts to protect herself and her children from Defendant. Tennessee Rule of Evidence 803(3) provides the following exception to the general rule excluding the admission of hearsay evidence:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . .

Tenn. R. Evid. 803(3). Pursuant to this rule, otherwise inadmissible hearsay may be admitted to establish the declarant's conduct consistent with the declarant's mental state at the time that the statement was made. We agree that the victim's hearsay statements made to Mr. Gaither were admissible pursuant to Rule 803(3) to establish the victim's mental state and were probative of the victim's attempts to leave Defendant and her efforts to protect herself and her children from Defendant.

Turning to the third issue, the statements contained in the order of protection application include: that Defendant assaulted the victim when she informed him that she intended to leave with the children, that the victim suspected that Defendant was molesting K.T., that the victim did not want Defendant around herself or the children, and that Defendant threatened to retaliate if the victim kept K.T. from him. Applying the forfeiture by wrongdoing exception to the hearsay rule, the trial court found that, by the time that the victim provided the statements in the order of protection application, the relationship between the victim and Defendant "had deteriorated to such a point" that the State was able to show by a preponderance of the evidence that Defendant's motive for killing the victim was to prevent her from prosecuting him for assaultive offenses

committed against herself and K.T.  Contrary to Defendant's argument on appeal, the trial court did not admit the statements via the public records exception to the rules of evidence, but the trial court did admit the statements as admissible hearsay pursuant to the forfeiture by wrongdoing exception to the hearsay rule.

Tennessee Rule of Evidence 804(b)(6) provides:

> A statement [made by an unavailable declarant] offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness.

Tenn. R. Evid. 804(b)(6).  This case is similar to *State v. Ivy*, 188 S.W.3d 132, 146 (Tenn. 2006), wherein the trial court found that Defendant killed the declarant-victim in order to prevent her from going to the police about an aggravated assault he had committed against the declarant-victim.  The court admitted the statements of the declarant-victim concerning the aggravated assault.  The record reflects that the trial court made the requisite findings before admitting the statements pursuant to the forfeiture by wrongdoing exception to the hearsay rule.  The record does not preponderate against the trial court's factual findings, and on de novo review, we conclude that the victim's statements contained in the order of protection application were admissible pursuant to the forfeiture by wrongdoing exception to the hearsay rule.  Thus, Defendant is not entitled to relief as to any of the challenges to the trial court's admitting the victim's statements.

*Admission of Evidence of Other Acts*

Defendant contends that the trial court erroneously admitted evidence of other acts in violation of Tennessee Rule of Evidence 404(b).  He specifically objects to the testimony of J.W.I. and J.S.I that Defendant broke the victim's cellular phone on one occasion and that they both saw the victim red-faced after hearing a "slap" while overhearing Defendant and victim arguing.  Defendant claims that the evidence was inadmissible character evidence, admitted to show that Defendant committed previous assaults and was dangerous.  Defendant also objects to K.T.'s testimony concerning the alleged acts of sexual abuse committed by Defendant because, he argues, the prior acts were not established by clear and convincing proof.

The State argues that the evidence elicited from the brothers is relevant to Defendant's motive to kill the victim because in each instance the bad acts occurred amidst the victim's threats to telephone the police.  As to the evidence of sexual acts

committed against K.T., the State argues that the acts were established by clear and convincing evidence and were probative of Defendant's motive to kill the victim.

Rule 404(b) of the Tennessee Rules of Evidence provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes.

In *State v. Mallard*, 40 S.W.3d 473, 487 (Tenn. 2001), our supreme court held that "evidence that the defendant has committed some other crime wholly independent of that for which he is charged, even though it is a crime of the same character, is usually not admissible because it is irrelevant." Nonetheless, where the prior crime "is relevant to some matter actually in issue in the case on trial and if its probative value as evidence of such matter in issue is not outweighed by its prejudicial effect upon the defendant, then such evidence may be properly admitted." *Mallard*, 40 S.W.3d at 487. Additionally, this court has previously stated, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." *State v. Luellen*, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992).

To admit such evidence, Rule 404(b) specifies the following:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn R. Evid. 404(b).

"The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on evidence of *prior* crimes, wrongs or acts." *State v. Gilley*, 173 S.W.3d 1, 5 (Tenn. 2005) (citing *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002))

(emphasis in original). Should a review of the record indicate that the trial court substantially complied with the requirements of Rule 404(b), the trial court's admission of the challenged evidence will remain undisturbed absent an abuse of discretion. *James*, 81 S.W.3d at 759; *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997).

Defendant concedes that the trial court conducted the requisite inquiry before admitting the other act evidence. The trial court determined that the acts were established by clear and convincing evidence, that they were probative of Defendant's motive to kill the victim – to conceal and continue his sexual abuse of K.T. – and that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

Although the trial court admitted the prior acts of abuse, the trial court also limited the State and its witnesses from referring to the sexual acts committed against K.T. as "rape" because K.T. did not specify in her pretrial testimony whether the sexual activity occurred with her consent. At trial, K.T. testified extensively that the abuse occurred without her consent. She recounted the sexual acts committed by Defendant, the frequency of the acts, and her fear of Defendant. Overall, her testimony established that the sexual activity occurred without her consent. To the extent that Defendant now complains that K.T. characterized the abuse as "rape" once during her testimony, we determine that single reference is of no consequence to our analysis concerning the propriety of the trial court's ruling.

The State's theory at trial was that Defendant killed the victim in an effort to conceal and continue the sexual abuse of K.T. when the victim threatened to telephone the police. In that vein, the testimony of J.S.I. and J.W.I. concerning Defendant's two prior assaults on the victim, which occurred during arguments about Defendant's relationship with K.T. and when the victim threatened to telephone the police, were highly probative of Defendant's motive. Likewise, K.T.'s testimony concerning the sexual abuse she suffered from Defendant was highly probative of motive. The sexual acts were established by clear and convincing evidence and corroborated at trial by the testimony of both J.S.I. and J.W.I. who testified at trial to witnessing inappropriate conduct between Defendant and K.T. We conclude that the trial court did not abuse its discretion by admitting this evidence. Accordingly, Defendant is not entitled to relief as to this issue.

*Admission of Photographs of Bone Fragments*

Defendant argues that the trial court erroneously admitted photographs of bone fragments that he claims were gruesome and inflammatory. The State argues that the photographs were in no manner gruesome. The State asserts that they were relevant to

Doctor Symes' testimony concerning the saw used to dismember the victim and that the trial court committed no abuse of discretion by admitting the photographs.

It is within a trial court's discretion to admit photographic evidence at trial, and this court will not reverse the trial court's determination absent an abuse of discretion. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). However, before a photograph may be admitted into evidence, the relevance of the photograph must be established, and the probative value of the photograph must outweigh any prejudicial effect. *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Doctor Symes testified concerning the manner in which the victim's feet, hands, and neck/head were removed. He utilized the photographs of bone fragments to illustrate and explain that the cuts were consistent with having been made by a standard skill saw blade. The photographs were not gruesome in any way and merely showed the forensic samples examined by Doctor Symes as they were packaged in plastic bags. We conclude that the photographs were relevant to the manner in which Defendant dismembered the victim's body, and we further determine that the admission of the photographs was not outweighed by any prejudicial effect. Accordingly, Defendant is not entitled to relief on this issue.

*Alleged Discovery Violation*

Defendant argues that the trial court should have excluded crime scene photographs of luminol testing that were not provided during discovery. *See* Tenn. R. Crim. P. 16(a)(1)(F). The State argues that the record does not establish that a discovery violation occurred and that, assuming the photographs were not provided, Defendant cannot establish any prejudice from the alleged discovery violation.

Tennessee Rule of Criminal Procedure 16(a)(1)(F)(iii) provides, in pertinent part:

Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, . . . if the item is within the state's possession, custody, or control and:
> . . .

(iii) the government intends to use the item in its case-in-chief at trial.

Tenn. R. Crim. P. 16(a)(1)(F)(iii). To enforce the rule, Rule 16(d)(2), provides that if there has been noncompliance, the trial court may order the offending party to permit the discovery or inspection, grant a continuance, prohibit the introduction of the evidence not disclosed or enter such other order as the court deems just under the circumstances.

"[T]here is no mandatory exclusion that follows a violation." *State v. Sherri Mathis*, M2009-00123-CCA-R3-CD, 2012 WL4461767, at *37 (Tenn. Crim. App., Sept. 26, 2012), *perm. app. denied* (Tenn. Feb. 25, 2013). Indeed, exclusion of the evidence is disfavored.

> [E]vidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated. *See* Rule 16(d)(2). The exclusionary rule should not be invoked merely to punish either the State or the defendant for the deliberate conduct of counsel in failing to comply with a discovery order. The court's contempt powers should be employed for this purpose. Rules 12 and 16, as well as the other Rules of Criminal Procedure[,] were adopted to promote justice; they should not be employed to frustrate justice by lightly depriving the State or the defendant of competent evidence.

*State v. Garland*, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981); *State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984); *State v. Briley*, 619 S.W.2d 149, 152 (Tenn. Crim. App. 1981).

At trial, Defendant objected to the introduction of the photographs during Investigator Garey's testimony concerning his use of luminol to detect blood evidence in the Prince Rupert apartment. The State asserted that the photographs had been provided during discovery but had possibly shown up very dark on the compact disc provided to Defendant. The trial court took the issue under advisement pending Defendant's providing the compact disc of discovery items to the court for review and a determination of whether the items had, in fact, been provided. The trial court admitted the photographs, and the alleged discovery violation was not revisited until the motion for new trial hearing.

At the motion for new trial hearing, Defendant maintained that he never received the photographs and that had he received the photographs, he would have been able to refute Investigator Garey's testimony that luminol testing produced a degradation of DNA material precluding any serology analysis of the Prince Rupert apartment hallway bathroom. The trial court stated

> I remember the one thing that came up was that ya'll said you had received them. The photographs were basically black. They looked like over-exposed photographs that nobody could tell what they were. And when I first saw the one on the screen, I said well, that's just a –

˘32˘

there's nothing there, but then there was some faint glow or something like that they testified to.

There is no indication in the record that the trial court ever reviewed the compact disc that was provided to Defendant in discovery.

In our opinion, Defendant failed to establish that a discovery violation occurred relative to the crime scene photographs. Assuming for the sake of argument that the photographs were not provided, we further conclude that Defendant failed to establish any prejudice requiring exclusion of the photographs. Defendant confessed to dismembering the victim's body in the hallway bathroom. Indeed, during closing argument, defense counsel acknowledged "[o]f course there's going to be blood and lumin[o]l in [the apartment]. I'd be shocked if they hadn't found it." Furthermore, Investigator Garey could have testified regarding the luminol testing and the degradation of DNA evidence without the use of the photographs, which were only marginally instructive to show the results of the luminol testing. The overall effect of the photographs is neutral at best. Therefore, Defendant is not entitled to relief on this issue.

*Improper Closing Argument*

Defendant argues that the State's improper closing argument deprived him of a fair trial, citing to four instances of improper argument:

(1) the State's reference to the "rape," after the trial court had precluded the use of the word "rape" prior to trial;

(2) the State's characterization of Defendant as "mean;"

(3) the State's characterization of Defendant as having "never shed a tear" for the victim; and

(4) the State's utilization of a circular saw during rebuttal argument.

The State concedes that the reference to rape violated the trial court's pretrial order, but the State argues that the single reference cannot be prejudicial in light of K.T.'s testimony that Defendant had sex with her every other day, that she did not want to have sex with him, that he threatened her if she refused, and that he physically forced her to have sex when she protested. As to the other instances of alleged improper argument, the State contends that Defendant failed to object contemporaneously to them or include them in his motion for new trial.

All of the instances of alleged improper argument occurred during the State's rebuttal argument. The record reflects that the State utilized the saw during rebuttal argument by demonstrating a cutting motion as the power was turned on twice – once while discussing the fear K.T. must have experienced by seeing her mother dismembered and once more when describing Defendant as being "mean." The State then argued "the only person who shed one tear for Charlene Gaither was when [K.T.] sat in this stand and talked about her mother dying and she cried. This man never shed a tear for Charlene Gaither – never – never." Later, the State argued

> Instead he goes and makes sure everything is clean but he makes his kids do the cleaning. This is a nightmare. Horror films are supposed to end, you're supposed to be able to go home after the horror film. These children lived in a horror film. Twelve year old [K.T.] sat there and watched her mother be cut up and then a knife put to her throat and she was threatened to be killed, after she had been raped repeatedly by this man.

Defendant failed to object contemporaneously to any of these instances of alleged improper argument. At the motion for new trial hearing, Defendant raised as instances of improper argument only the State's characterization of him as "mean" and the reference to "rape."

As previously discussed, Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." *See also* Tenn. R. Evid. 103(d). As stated previously, our supreme court has held that appellate courts are not precluded from reviewing issues that are otherwise waived under the plain error doctrine. *Page*, 184 S.W.3d at 230. As previously explained, this court may only consider an issue as plain error, however, when all five of the following factors are met:

(1) the record must clearly establish what occurred in the trial court;

(2) a clear and unequivocal rule of law must have been breached;

(3) a substantial right of the accused must have been adversely affected;

(4) the accused did not waive the issue for tactical reasons; and

(5) consideration of the error is "necessary to do substantial justice."

*Adkisson*, 899 S.W.2d at 641-42 (footnotes omitted); *see also Smith*, 24 S.W.3d at 283 (adopting the *Adkisson* test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (internal quotations and citation omitted).

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. *See State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In *Goltz,* 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument:

> (1) intentionally misleading or misstating the evidence;

> (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;

> (3) making statements calculated to inflame the passions or prejudices of the jury;

> (4) injecting broader issues than the guilt or innocence of the accused; and

> (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]

> (2) the curative measures undertaken by the court and the prosecution[;]

(3) the intent of the prosecutor in making the statement[;]

(4) the cumulative effect of the improper conduct and any other errors in the record[; and]

(5) the relative strength or weakness of the case.

*Id.* (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

At the motion for new trial hearing, the trial court reasoned that the pretrial prohibition of the use of the word "rape" stemmed from K.T.'s pretrial testimony and the trial court's understanding "that the child was not going to say that [the sexual contact] was without consent." The trial court determined that the single reference to rape did not amount to improper argument when viewed in light of K.T.'s testimony at trial that the sexual contact was without consent. We agree that the reference to rape was not improper in light of K.T.'s testimony at trial and that Defendant is not entitled to relief as to this allegation.

The trial court determined that the State's characterization of Defendant as "mean" was not improper or prejudicial in light of the overall arguments by both parties. We also agree with this determination and conclude that Defendant is not entitled to relief as to this allegation.

As to the allegation concerning the State's reference in rebuttal argument that Defendant "had not shed a tear" for the victim, Defendant failed to object to this statement at trial and also failed to raise it in his motion for new trial. We will not review this alleged misconduct.

Defendant contends that the State's use during rebuttal argument of the circular saw, which was turned on, to demonstrate how Defendant dismembered the victim's body in K.T.'s presence amounted to improper argument intended to inflame the jury. While we caution that the use of exhibits may, in certain circumstances, amount to an improper use of an exhibit that would tend to inflame the jury, *see*, *e.g.*, *State v. Payne*, 791 S.W.2d 10, 20 (Tenn. 1990), we conclude that the State's use of the circular saw was not improper in this case. The evidence established Defendant's use of the saw to dismember the victim's body in the presence of K.T. The State's demonstration during closing argument, while gruesome, was based upon the evidence presented at trial and was not *solely* a demonstration made by the prosecution "calculated to inflame the passions or prejudice of the jury." *Goltz*, 11 S.W.3d at 6; *cf. State v. Lemaricus Devall Davidson*, E2013-00394-CCA-R3-DD, 2015 WL 1087126, at *26 (Tenn. Crim. App., Mar. 10,

2015) (admission of photographs not error when, although photographs "were disturbing, we are mindful that the injuries inflicted upon the victims were also disturbing"). Accordingly, Defendant is not entitled to relief as to any of his allegations of improper argument.

*Sufficiency of the Evidence*

Defendant argues that the evidence is insufficient to support his conviction for first degree murder because there is insufficient proof of premeditation, other than the uncorroborated testimony of K.T., whom Defendant characterizes as an accomplice. The State argues that K.T. was not an accomplice and that, therefore, the proof is more than sufficient to sustain Defendant's conviction of premeditated first degree murder.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 99 S. Ct. 2781, 2789 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d. 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact to be determined by the jury. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Premeditation "may be established by proof of the circumstances surrounding the killing." *Suttles*, 30 S.W.3d at 261. The Tennessee Supreme Court noted that there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon,

the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id.*; *see Bland*, 958 S.W.2d at 660.

> Our supreme court recently explained the accomplice corroboration rule as follows When the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law. *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little*, 402 S.W.3d 202, 211-12 (Tenn .2013)). This Court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *Id.* (citing *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004); *Clapp v. State*, 94 Tenn. 186, 30 S.W. 214, 216 (1895)). The test for whether a witness qualifies as an accomplice is "'whether the alleged accomplice could be indicted for the same offense charged against the defendant.'" *Id.* (quoting *Monts v. State*, 214 Tenn. 171, 379 S.W.2d 34, 43 (1964)). Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, "corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; *it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.*" *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). Corroborative evidence must lead to the inferences that a crime has been committed and that the defendant is implicated in the crime. *Id.*

*State v. Jones*, 450 S.W.3d 866, 887-88 (Tenn. 2014) (emphasis in original).

The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of a trial. *Bethany v. State*, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978). When the undisputed evidence clearly establishes the witness is an accomplice as a matter of law, the trial court, not the jury, must decide this issue. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). On the other hand, if the evidence adduced at trial is unclear, conflicts, or is subject to different inferences, the jury, as the trier of fact, is to decide if the witness is an accomplice. *Id.* Under either scenario, the issue of whether the witness's testimony has been sufficiently corroborated becomes a matter entrusted to the jury as the trier of fact. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994).

Notably, Defendant did not request a jury instruction concerning the accomplice corroboration rule. That being said, we agree with the State that K.T. was not an

accomplice in this case. The evidence at trial established that twelve-year-old K.T. was victimized and controlled by Defendant in the months leading up to the victim's death. K.T. testified that she saw Defendant obtain a small knife from the kitchen, approach the victim in the bedroom, and slit the victim's throat when the victim threatened to telephone the police. K.T. watched in stunned silence as Defendant held the victim until she died. She stated that Defendant then threatened her life if she did not assist him in disposing of the victim's body. The proof does not establish that K.T. "knowingly, voluntarily, and with common intent with the principal unite[d] in the commission of a crime." *Collier*, 411 S.W.3d at 894. To the contrary, the evidence at trial established that K.T. was yet another victim of Defendant's control and domination. Furthermore, even if we were to consider K.T. an accomplice, J.W.I. and J.S.I.'s testimonies, as well as the physical evidence collected at the apartment, all corroborate K.T.'s testimony implicating Defendant in the premeditated first degree murder of the victim. Therefore, we conclude that there is sufficient evidence to support Defendant's conviction of first degree murder. Accordingly, Defendant is not entitled to relief as to this issue.

## SENTENCING PHASE ISSUES

*Discovery of Investigation of James Hawkins, Sr.*

Defendant contends that the trial court erred by failing to require the State to provide discovery related to the State's investigation of James Hawkins, Sr., concerning the sexual abuse of Defendant's sisters. Evoking *Brady v. Maryland*, Defendant argues that the State's failure to provide the investigative file deprived Defendant of information relevant to mitigation. He claims that evidence in the file could have established Defendant's exposure to abuse and violence as a child. The State counters that Defendant has failed to establish prejudice from the denial of access to the prosecution's investigative file of Defendant's father because Defendant presented ample evidence of his father's alleged sexual abuse of Defendant's sisters.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Tennessee Supreme Court has held that a defendant must show four elements in order to establish a *Brady* violation by the State:

> (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

(2) that the State suppressed the information;

(3) that the information was favorable to the accused; and

(4) that the information was material.

*Johnson v.* State, 38 S.W.3d 52, 56 (Tenn. 2001).

"Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and *evidence that could be used to impeach the State's witnesses.*"  *Id*. at 55-56 (emphasis added).  "Evidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Id*. at 58 (quoting *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995).  In determining whether a defendant has adequately proven the materiality of favorable evidence suppressed by the State, "a reviewing court must determine whether the defendant has shown that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.'"  *Johnson*, 38 S.W.3d at 58 (quoting *Irick v. State*, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998).

Ms. Stanback, the mitigation specialist, testified concerning Mr. Hawkins' sexual abuse of Defendant's sisters.  Likewise, she also testified concerning the pending criminal investigation.  Ms. Thomas, Defendant's mother, testified that she had only recently learned of the sexual abuse allegations and that Defendant's father was only involved in a limited fashion during Defendant's childhood.  Under these circumstances, we agree that Defendant has failed to establish the materiality of the pending criminal investigation.  Accordingly, Defendant is not entitled to relief as to this issue.

*Special Requested Jury Instruction Regarding Presumptive Sentences*

Defendant argues that the trial court should have instructed the jury that "they were to presume that a life sentence, a sentence of life without the possibility of parole, and a death sentence would be carried out in accordance with the laws of the state."  The State correctly notes that this issue has been ruled to be without merit.  *State v. Thomas*, 158 S.W.3d 361, 389-90 (Tenn. 2005).

*Constitutional Attacks on the Death Penalty*

Defendant makes myriad constitutional arguments concerning Tennessee's death penalty statute in general, as well as the imposition of the death penalty in this case. Although not raised in this order in Defendant's brief, we will address each one in turn for the sake of clarity and cogency of our discussion.

Defendant argues that Tennessee Code Annotated section 40-23-114, concerning the implementation of a lethal injection protocol, is an unconstitutional delegation of legislative authority to the executive branch by permitting "the department of correction . . . to promulgate necessary rules and regulations to facilitate the implementation" of a death sentence. T.C.A. § 40-23-114(c). The State argues that the legislature has determined a conviction of first degree murder accompanied by aggravating circumstances is punishable by death and that the method of execution shall be lethal injection. Allowing the department of correction to establish a protocol for the implementation of lethal injection does not constitute an unconstitutional delegation of legislative authority. *See Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 309-310 (Tenn. 2005) (holding that the department of correction may be tasked with determining protocol without violating substantive or procedural due process).

Defendant argues that Tennessee Code Annotated section 39-13-204(h), the unanimity requirement of the capital sentencing statute, is unconstitutional because it precludes an instruction regarding the effect of a failure to agree on punishment. The State fails to address this argument. In any event, this issue has been held to be without merit. *State v. Vann*, 976 S.W.2d 93, 118 (Tenn. 1998).

Citing to *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000), Defendant argues that the aggravating circumstances sought by the State to support the imposition of the death penalty must be indicted by the grand jury. The State correctly notes that this issue has been ruled to be without merit. *Thomas*, 158 S.W.3d at 389-90.

Defendant argues that the trial court's use of the pattern instruction concerning victim impact evidence amounted to an unconstitutional intrusion into the province of the jury. The State correctly notes that this issue has been ruled to be without merit. *State v. Banks*, 271 S.W.3d 90, 171-72 (Tenn. 2008).

Defendant argues that the death sentence is arbitrary and disproportionate. Specific to the application of aggravating circumstances in this case, he contends that the sentence is arbitrary because the trial court failed to determine whether his prior convictions for aggravated assault involved the use of violence as required by *State v. Sims*, 45 S.W.3d 1 (2001). The State correctly notes that Defendant failed to avail himself of a *Sims* hearing when offered by the trial court, and thereby waived any

objection to the consideration of the aggravated assault convictions as prior violent felonies. In any event, the ten remaining aggravated robbery convictions would render the inclusion of the seven aggravated assault convictions harmless error, if error at all.

Defendant also contends that the death sentence is disproportionate when compared to a broadened pool of first degree murder cases. This challenge to the appellate review of capital cases have also been rejected. *State v. Cazes*, 875 S.W.2d 253, 270-71 (Tenn. 1994) (rejecting certain arguments concerning proportionality review); *State v. Pruitt*, 415 S.W.3d 180 (Tenn. 2013) (refusal to broaden the pool of cases considered in proportionality review).

Defendant challenges the constitutionality of the death penalty in that aggravating circumstances (i)(2), (i)(5), (i)(6), and (i)(7) fail to narrow meaningfully the class of eligible offenders. The State correctly notes that Defendant lacks standing to object to the application of circumstances (i)(5), (i)(6), and (i)(7) because they were neither sought nor found his case. As to his challenge to the application of (i)(2), that the aggravating circumstance is overbroad because it has been construed to include as a prior conviction any conviction which occurs prior to the sentencing hearing regardless of whether the offense occurred prior to the first degree murder for which the defendant is being sentenced, this argument must also fail. *State v. Nichols*, 877 S.W.2d 722, 736 (Tenn. 1994). Furthermore, we note that the prior convictions that were utilized in this case concerned offenses that occurred years before the present offenses and, therefore, fall squarely into that category of prior convictions to which Defendant seeks to limit the application of the circumstance.

Defendant contends that prosecutorial discretion in seeking the death penalty results in the unconstitutional and discriminatory imposition of the death penalty. This argument has been rejected. *Banks*, 271 S.W.3d at 155-58.

Finally, Defendant contends that the pattern jury instructions create the mistaken belief that jurors must agree unanimously on mitigating circumstances. This challenge to the pattern jury instruction has likewise been rejected. *Banks*, 271 S.W.3d at 159.

*Proportionality Review*

In reviewing a case where a defendant has been sentenced to death, this court must apply a comparative proportionality analysis. Tennessee Court Annotated section 39-13-206 provides that "the reviewing court shall determine whether . . . the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." T.C.A. § 39-13-206.

Our supreme court has explained comparative proportionality review as follows:

> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997). A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." *Id.* (citing *State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. 1993)). A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997) (citing *State v. Carter*, 714 S.W.2d 241, 251 (Tenn. 1986)). Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." *Bland*, 958 S.W.2d at 665. Our duty "is to assure that no aberrant death sentence is affirmed." *Id.* (citing *State v. Webb*, 238 Conn. 389, 680 A.2d 147, 203 (Conn. 1996)).

> Our proportionality review is neither a rigid nor an objective test. *Hall*, 958 S.W.2d at 699. There is no "mathematical formula or scientific grid," and we are not bound to consider only cases in which the same aggravating circumstances were found applicable by a jury or trier of fact. *Id.; Brimmer*, 876 S.W.2d at 84. This Court considers many variables when choosing and comparing cases. *Bland*, 958 S.W.2d at 667. Among these variables are: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. *Id.*; *Hall*, 958 S.W.2d at 699. Factors considered when comparing characteristics of defendants include: (1) the defendants' prior criminal record or prior criminal activity; (2) the defendants' age, race, and gender; (3) the defendants' mental, emotional or physical condition; (4) the defendants' involvement or role in the murder; (5) the defendants' cooperation with authorities; (6) the defendants' remorse; (7) the defendants' knowledge of helplessness of victim(s); and (8) the defendants' capacity for rehabilitation. *Id.*

*State v. Hall*, 976 S.W.2d 121, 135 (Tenn. 1998).

We have compared the circumstances of the present case with the circumstances of similar cases and conclude that the sentence of death in this case is proportionate to the sentences imposed in similar cases. *See*, *e.g.*, *State v. Davidson*, 121 S.W.3d 600 (Tenn. 2003) (affirming death sentence where defendant had committed prior violent felonies and had severed the victim's head and hand); *Terry v. State*, 46 S.W.3d 147 (Tenn. 2001) (affirming death sentence where defendant severed the victim's head and hand); *State v. Bondurant*, 4 S.W.3d 662 (Tenn. 1999) (affirming death sentence where defendant dismembered the victim's body). Likewise, the application of the prior violent felony aggravating circumstance – a circumstance which the supreme court has described as "more qualitatively persuasive and objectively reliable than others," *State v. Howell*, 868 S.W.2d 238, 261 (Tenn. 1993) – lends further support to our conclusion that the sentence imposed in this case is proportionate to sentences imposed in similar cases.

*Sentencing on Related Felonies*

Defendant argues that the trial court's imposition of sentences for the remaining felonies is excessive in both length and manner of service. At the sentencing hearing concerning the false report and abuse of a corpse convictions, the trial court sentenced Defendant as a Career Offender to a total effective sentence of 18 years. The trial court also ordered the sentences to be served consecutively based upon its findings that Defendant was a professional criminal and qualified as a dangerous offender.

First, Defendant argues that the State's notice to seek enhanced punishment was misleading because the notice cited to the code section concerning Career Offender but indicated in the language of the notice that the State sought to sentence Defendant as a Persistent Offender. The State argues that the typographical inconsistency on the notice to seek enhanced punishment did not render it invalid and, in any event, Defendant stipulated at the penalty phase of the trial the accuracy of his criminal history.

The purpose of the notice requirement is to provide a defendant with "fair notice" that he is "exposed to other than standard sentencing." *State v. Adams*, 788 S.W.2d 557 (Tenn. 1990). It is intended to facilitate plea-bargaining, to inform decisions to enter a guilty plea, and to assist with decisions regarding trial strategy. When a detail of the required information is omitted or incorrect, the inquiry should be whether the notice was "materially misleading." *Id.* at 559. The supreme court specifically held that "when the State has substantially complied with Section 40-35-202(a), an *accused has a duty to inquire about an ambiguous or incomplete notice* and must show prejudice to obtain relief. But it is the State's responsibility to assert the appropriate sentencing status in the

first instance, and it may not shift these burdens to an accused by filing what is essentially an empty notice." *Id.* (emphasis added).

The record reflects that Defendant did not challenge the notice to seek enhanced punishment and, in fact, stipulated the accuracy of his prior convictions at the penalty phase of the first degree murder trial. Based upon this stipulation, the trial court sentenced Defendant as a Career Offender. We conclude that the notice to seek enhanced punishment was not materially misleading. Defendant is not entitled to relief on this issue.

Next, Defendant contends that the record does not support the trial court's determination that he is a professional criminal. The State acknowledges that the record does not support the trial court's finding of professional criminal but argues that the record supports the trial court's alternative determinations that Defendant possessed an extensive history of criminal convictions and that he was a dangerous offender, justifying the imposition of consecutive sentences in this case.

Our supreme court has held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations" "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *State v. Pollard*, 432 S.W.3d 851, 859-62 (Tenn. 2013). Thus, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" T.C.A. § 40-35-103(2) and (4). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal.")); *see also State v. Bise*, 380 S.W.3d 682, 705 (Tenn. 2012). The application of an abuse of discretion with a presumption of reasonableness standard of review when considering consecutive sentencing based upon the "dangerous offender" category in T.C.A. § 40-35-115(b)(4) does not eliminate the requirements of *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995) that the "proof must also establish that the terms [of sentencing] imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." *Pollard*, 432 S.W.3d at 863 (quoting *Wilkerson*, 905 S.W.2d at 938).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation;
or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b).

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. Here, the trial court applied factors (1), (2), and (4) that Defendant is a professional criminal who knowingly devoted his life to criminal acts as a major source of his livelihood, an offender whose history of criminal activity is extensive, and a dangerous offender whose behavior indicates little or no regard for human life. Because the trial court provided reasons on the record

˘46˘

establishing two of the statutory grounds for consecutive sentencing – extensive criminal history and dangerous offender – we afford the trial court's decision a presumption of reasonableness. Furthermore, the record shows that the trial court followed the principles and purposes of the Sentencing Act, and the record supports the trial court's findings. We conclude that the trial court did not abuse its discretion by ordering Defendant's sentences to run consecutively. Accordingly, Defendant is not entitled to relief on this issue.

*Denial of Petition for Writ of Error Coram Nobis*

On October 30, 2013, while this appeal was pending, Defendant filed a petition for writ of error coram nobis in the trial court alleging that previously undisclosed DNA testing of fetal tissue collected at K.T.'s hospitalization for the December 2007 miscarriage and the State's subsequent indictment of James Hawkins, Sr., for multiple instances of sexual abuse committed against Defendant's sisters warranted coram nobis relief in the form of a new trial. Following a hearing, the trial court denied relief, concluding that the DNA testing result, which was inconclusive as to paternity, would not have resulted in a different judgment had it been presented at trial and that the evidence concerning Defendant's father's history of sexually abusing Defendant's sisters was known and presented at trial as mitigation evidence.

On appeal, Defendant argues that the trial court erred in denying coram nobis relief. The State argues that the DNA evidence was inconclusive as to paternity and, therefore, could not reasonably affect the outcome of the trial; and that the evidence concerning Defendant's father was known and presented at trial and, therefore, does not qualify as newly discovered pursuant to the coram nobis statute.

A writ of error coram nobis is a very limited remedy which allows a petitioner the opportunity to present newly discovered evidence "which may have resulted in a different verdict if heard by the jury at trial." *State v. Workman*, 41 S.W.3d 100, 103 (Tenn. 2001); *see also State v. Mixon*, 983 S.W.2d 661 (Tenn. 1999). The remedy is limited "to matters that were not and could not be litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas proceeding." T.C.A. § 40-26-105. Examples of newly discovered evidence include a victim's recanted testimony or physical evidence which casts doubts on the guilt of the Petitioner. *Workman*, 41 S.W.3d at 101; *State v. Ratliff*, 71 S.W.3d 291 (Tenn. Crim. App. 2001); *State v. Hart*, 911 S.W.2d 371 (Tenn. Crim. App. 1995). The Supreme court has stated the following concerning the standard to be applied when a trial court reviews a petition for writ of error coram nobis:

[T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). Whether to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. *Id.* at 527-28.

The record reflects that the DNA testing neither excluded nor established Defendant's paternity because the testing yielded no evidence of paternal DNA. We agree with the trial court that such inconclusive results, when viewed in light of the testimony presented at trial that K.T. suffered a miscarriage and that Defendant was the person who impregnated her, would not have resulted in a different outcome if presented at trial. *See*, *e.g.*, *Antonio Leonard Sweatt v. State*, M2006-00289-CCA-R3-PC (Tenn. Crim. App., at Nashville, May 9, 2007), *perm. app. denied* (Tenn. Sept. 24, 2007) (inconclusive DNA results do not warrant coram nobis relief). As to Defendant's claim concerning his father's subsequent indictment for sexually abusing Defendant's sisters, the evidence presented at trial concerning the sexual abuse supports the trial court's findings that this evidence does not qualify as newly discovered. Therefore, we conclude that the trial court did not abuse its discretion by denying coram nobis relief. Defendant is not entitled to relief as to this issue.

### Cumulative Error

Defendant argues that the cumulative effect of the alleged errors entitle him to a new trial. Because we conclude any error was harmless beyond a reasonable doubt, we further conclude that Defendant's due process rights were not violated by any cumulative effect of the alleged errors.

### CONCLUSION

In accordance with Tennessee Code Annotated section § 39-13-206(c), we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the trial court's finding of the statutory circumstances, that the evidence supports the trial court's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that

the sentence is not disproportionate.   We have also reviewed all issues raised by Defendant and conclude there is no reversible error. The judgments of the trial court are affirmed.


_____

_

JUDGE

THOMAS   T.   WOODALL,   PRESIDING